US DISTRICT COURT INDEX SHEET









USA

NAGHDI

TB

3:88-CR-768

*69*

*CRBR*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

JAVID NAGHDI,
a/k/a David Naghdi,
a/k/a Cregorio Reynolds,
a/k/a Khukon Reynolds,
a/k/a Doctor Behrouz Mansouri,
    PETITIONER,

v.       No.  **'961528 K**
                *crim 88-cr-768 K*

UNITED STATES OF AMERICA,
    RESPONDENT.

---

PETITION UNDER 28 USC § 2255 TO VACATE, SET ASIDE, OR
CORRECT

BRIEF OF PETITIONER

---

THE HON. JUDITH N. KEEP, DISTRICT COURT JUDGE

---

JOB SEREBROV, Attorney at Law
Ark. Att. No. 94006
P.O. Box 1427
Siloam Springs, AR  72761
501-575-0576
ATTORNEY FOR PETITIONER



69

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

JAVID NAGHDI,
a/k/a David Naghdi,
a/k/a Cregorio Reynolds,
a/k/a Khukon Reynolds,
a/k/a Doctor Behrouz Mansouri,
    PETITIONER,

v.          No. _____

UNITED STATES OF AMERICA,
    RESPONDENT.

PETITION UNDER 28 USC § 2255 TO VACATE, SET ASIDE, OR CORRECT

BRIEF OF PETITIONER

THE HON. JUDITH N. KEEP, DISTRICT COURT JUDGE

JOB SEREBROV, Attorney at Law
Ark. Att. No. 94006
P.O. Box 1427
Siloam Springs, AR  72761
501-575-0576
ATTORNEY FOR PETITIONER

# TABLE OF CONTENTS

Number                                                    Page

I.    AUTHORITIES CITED . . . . . . . . . . . . . . . . .   i

II.   STATEMENT OF JURISDICTION . . . . . . . . . . . . . iv

III.  STATEMENT OF ISSUES . . . . . . . . . . . . . . . .   1

IV.   STATEMENT OF THE CASE . . . . . . . . . . . . . . .   3

V.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . .  7

VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . 29


Exhibits

A     Transcript of Sentencing . . . . . . . . . . . . . . 28

B     Transcript of Status Hearing . . . . . . . . . . . . 38

C     Transcript of In Chambers Conference . . . . . . . . 40

D     Appelee's Brief . . . . . . . . . . . . . . . . . . . 46

E     Appellant's Brief . . . . . . . . . . . . . . . . . . 54

F     9th Circuit Opinion . . . . . . . . . . . . . . . . . 56

G     Extradition Treaty . . . . . . . . . . . . . . . . . 59

H     Memorandum of Telephone Conversation . . . . . . . . 74

## AUTHORITIES CITED

### CASES

1.  Butcher v. Marquez,
    758 F.2d 373, 376 (9th Cir. 85) . . . . . . . . . 24

2.  Lockhart v. Fretwell,
    113 S.Ct. 838 (1993) . . . . . . . . . . . . . . . 18

3.  McCleskey v. Zant,
    499 U.S. 467, 111 S.Ct. 1454 (1991) . . . . . . . . 8

4.  Powell v. Alabama,
    287 U.S. 45 (1932) . . . . . . . . . . . . . . . . 18

5.  Strickland v. Washington,
    466 U.S. 6898 (1984) . . . . . . . . . . . . . 18, 25

6.  United States v. Anderson,
    942 F.2d 606 (9th Cir. 1991) (en banc) . . . . . 7, 21

7.  United States v. Kahn,
    993 F,2d 1368, 1373-74 (9th Cir. 1993) . . . . . 15, 24

8.  United States v. Fowlie,
    24 F.3d 1059, 1063-64 (9th Cir. 1994) . . . . . 15, 24

9.  United States v. Howard,
    894 F.2d 1085, 1087 (9th Cir. 1989) . . . 6, 9, 13, 20

10. United States v. Johnson,
    988 F.2d 941, 945 (9th Cir. 93) . . . . . . . . . 17

11. United States v. Lira-Barraza,
    941 F.2d 745,751 (9th Cir. 1991) . . . . . . . . 11, 12

12. United States v. Lopez Quintero,
    21 F.3d 885,894 (9th Cir. 1994) . . . . . . . . 11, 12

13. United States v. Pope,
    841 F.2d 954 (9th Cir. 1988) . . . . . . . . . . . 17

14. United States v. Restrepo,

903 F.2d 648, 651 (9th Cir. 1990)   6, 8, 9, 10, 12, 13

15. United States v. Rewald,
    889 F.2d 836, 859 (9th Cir. 1989) . . . . . . . . . 17

16. United States v. Schaflander,
    743 F.2d 714, 717 (9th Cir. 1984); cert. denied,
    470 U.S. 1058, 105 S. Ct. 1772 (1985) . . . . . . . 17

## STATUTES

1. 18 U.S.C. § 1321 . . . . . . . . . . . . . . . . . . . ii

2. 18 U.S.C. § 3553 (b)(88) . . . . . . . . . . . . . . 10

3. 28 U.S.C. § 1294(1) . . . . . . . . . . . . . . . . . ii

4. 28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . 17

5. Classified Information Protection Act . . . . . . . 19

6. U.S.S.G. 2F1.1 (1988) . . . . . . . . . 9, 10, 11, 22

7. U.S.S.G. 3B1.1 . . . . . . . . . . . . . . . 20, 21, 22

## RECORD CITATIONS INDEX

ST   Transcript of Sentencing
     Case No. 88-0768-K-Crim
     U.S. District Court, Southern District of California
     Monday, May 7th, 1990
     **Selected Pages Attached as Exhibit A**

T1   Transcript of Status Hearing
     January 30th, 1990
     **Selected Pages Attached as Exhibit B**

T2   Transcript of in Chambers Conference
     January 31st, 1990
     **Selected Pages Attached as Exhibit C**

AE     Appellee's Brief
       Appeal to the Ninth Circuit
       U.S.C.A. No. 90-50300
       U.S.D.C. No. 88-0768-01-K
       **Selected Pages Attached as Exhibit D**

AB     Appellant's Brief
       Appeal to the Ninth Circuit
       U.S.C.A. No. 90-50300
       U.S.D.C. No. 88-0768-01-K
       **Selected Pages Attached as Exhibit E**

OP     9th Circuit Court of Appeals Opinion (Unpublished)
       No. 90-50300
       <u>United States of America v. Naghdi</u>
       **Selected Pages Attached as Exhibit F**

## STATEMENT OF JURISDICTION

This Petition under 28 USC § 2255 arises from the decision rendered by this Court, Hon. Judith N. Keep presiding, against Javid Naghdi on May 8th, 1990.  Judgement was entered on the same date.  This Court had jurisdiction to hear the case pursuant to 18 U.S.C. § 3231.  Naghdi filed a timely notice of Appeal on May 16th, 1990.  Naghdi appealed his sentence to the United States Court of Appeals for the Ninth Circuit.  That court had jurisdiction pursuant to 28 U.S.C. § 1294(1).  The Ninth Circuit affirmed the district court on September 10th, 1991.

iv

## STATEMENT OF ISSUES

I.  THE DISTRICT COURT COMMITTED ERROR WHEN IT HELD THAT
    NAGHDI WAS AN ORGANIZER FOR SENTENCING PURPOSES

    A.  STANDARD . . . . . . . . . . . . . . . . . . 6

    B.  RELEVANT FACTS . . . . . . . . . . . . . . . 6

    C.  THE RULE . . . . . . . . . . . . . . . . . . 7

    D.  THE DISTRICT COURT'S APPLICATION . . . . . . 8

    E.  THE PROPER APPLICATION . . . . . . . . . . . 8

    F.  CAUSE AND PREJUDICE . . . . . . . . . . . . . 8


II. THE DISTRICT COURT COMMITTED ERROR WHEN IT HELD THAT
    THE AMOUNT OF LOSS WAS SIX HUNDRED AND SIX MILLION, TWO
    THOUSAND, TWO HUNDRED AND NINETY-TWO DOLLARS

    A.  STANDARD . . . . . . . . . . . . . . . . . . 9

    B.  FACTS . . . . . . . . . . . . . . . . . . . . 9

    C.  THE RULE . . . . . . . . . . . . . . . . . . 10

    D.  THE DISTRICT COURT'S APPLICATION . . . . . . 12

    E.  THE PROPER APPLICATION . . . . . . . . . . . 12

    F.  CAUSE AND PREJUDICE . . . . . . . . . . . . . 13

III. THE DISTRICT COURT COMMITTED ERROR WHEN IT SENTENCED
     NAGHDI FOR OFFENSES FOR WHICH HE HAD NOT BEEN
     EXTRADITED IN VIOLATION OF THE EXTRADITION TREATY

    A.  STANDARD . . . . . . . . . . . . . . . . . . 13

    B.  FACTS . . . . . . . . . . . . . . . . . . . . 14

C.   THE RULE . . . . . . . . . . . . . . . . 14

D.   THE DISTRICT COURT'S APPLICATION . . . . . . . 15

E.   THE PROPER APPLICATION . . . . . . . . . . . 16

F.   CAUSE AND PREJUDICE . . . . . . . . . . . . . 16

IV.  NAGHDI'S COUNSEL WAS INEFFECTIVE

A.   ISSUE . . . . . . . . . . . . . . . . . . 16

B.   STANDARD . . . . . . . . . . . . . . . . . 17

C.   FACTS . . . . . . . . . . . . . . . . . . 19

     1.  Counsel's Failure to Present Naghdi's Theory
         of Defense . . . . . . . . . . . . . . . 19

     2.  Counsel's Failure to Properly Object to the
         Court's Characterization of Naghdi as an
         "Organizer" for Sentencing Purposes . . . 20

     3.  Counsel's Failure to Properly Object to the
         Court's Determination the Amount of Loss . 22

     4.  Counsel's Failure to Properly Object to the
         Court's Consideration of An Earlier Crime in
         Violation of the Extradition Treaty . . . 23

D.   COUNSEL'S ACTIONS WERE DEFICIENT . . . . . . . 24

E.   COUNSEL'S DEFICIENT ACTIONS PREJUDICED NAGHDI . 25

## STATEMENT OF THE CASE

On September 23, 1988, a twenty-five count indictment was filed in the Southern District of California, charging Naghdi with 25 counts of violation of 18 U.S.C. 1343 wire fraud.  Sixteen of those counts were dismissed in February of 1990 and on March 6, 1990 Naghdi was convicted in this Court by jury verdict of the remaining nine counts.

This Court found that Naghdi had engaged in a scheme to manufacture and sell counterfeit pharmaceuticals.  The scheme consisted of two sale contracts which were never completed.  Naghdi facilitated these schemes through Milton Poland, Peter Poland, and Jack Russell.  All three of these individuals were fraudulently induced into acting on behalf of Naghdi. [AE 7-8].

The first contract, the Belrico deal, involved a proposed transaction whereby Naghdi agreed to sell 3,000,024 bottles of Tagamet, 3,000,024 bottles of Anspor, and 2,000,004 bottles of Naprosyn [AE 8] to the Government of Iran for $579,002,292, less commissions [AB 9].  This deal failed when Iran's representative, Michael Machura, and Jack Russell were denied access to inspect the pharmaceuticals prior to sale [AE 9-10].

The second contract, the Owens & Minor deal, involved a

3

proposed transaction between Naghdi and Owens & Minor (a legitimate pharmaceutical company) Saunders (an under cover federal agent) represented Owens & Minor and agreed to purchase one million bottles of Tagamet from Naghdi for 27 million dollars [AE 11-12]. This deal was not completed and ended with Naghdi's arrest [ACT 2].

During these schemes Naghdi improperly charged somewhere between $22,000 and $37,000 [ST 34] on his Citicorp Diner's Card and $20,000 on Milton Poland's American Express card.

Naghdi was arrested by Scotland Yard at the Dorchester Hotel in London England after a meeting with Saunders, the undercover federal agent, on August 11th, 1988 [AE 14].

### The District Court's Sentencing Errors

When sentencing Naghdi, this Court allocated four offence points as an organizer under U.S.S.G. 3B1, however, no findings were made to support this conclusion. Russell was named as co-organizer but the Government alleged Russell was a victim, unaware of Naghdi's plans.

This Court also allocated a total of seventeen offense points, more than half of Naghdi's total offense points, under U.S.S.G. 2F1.1, finding that the amount of the loss

4

resulting from Naghdi's fraud was $606,002,292 [ST 39].  The
pharmaceutical deals did not go through, however, and none
of this money was actually lost.

Judge Keep also raised Naghdi's Criminal History
Category to III based upon previous criminal acts for which
he was convicted.  Naghdi was extradited to the United
States from the United Kingdom under the U.K. Extradition
treaty of 1976 to be tried for the wire fraud charges, and
Judge Keep erred when she considered crimes for which he was
not extradited when she passed sentence.

### Ineffective Assistance of Counsel

Naghdi's counsel was ineffective in two main areas.  He
failed to present Naghdi's theory of defense and he failed
to make proper sentencing objections at trial and on appeal.

It has been Naghdi's contention that there were no
pharmaceuticals for sale during these transactions, that
instead he was operating under the direction of the Central
Intelligence Agency and involved in arms deals with Iran.
Naghdi wanted to call a number of government officials as
witnesses in his defense but the court was going to require
him to verify his supporting affidavits under penalty of
perjury.  Naghdi was willing to do so but his counsel would
not permit it, taking the position that this Court's

5

requirement was violative of Naghdi's Fifth Amendment
rights.   As a result the witnesses were never subpoenaed and
Naghdi's theory of defense was not presented.

Naghdi's counsel was also ineffective as he failed to
properly object to the sentencing errors committed by this
Court outlined above under the heading The District Court's
Sentencing Errors.

ARGUMENT

I

## THE DISTRICT COURT COMMITTED ERROR WHEN IT
## HELD THAT NAGHDI WAS AN ORGANIZER FOR SENTENCING PURPOSES

A

STANDARD

This Court's factual findings are reviewed for clear

error. United States v. Howard, 894 F.2d 1085, 1087 (9th

Cir. 1989). Questions of law are reviewed de novo. United

States v. Restrepo, 903 F.2d 648, 651 (9th Cir. 1990).

B

RELEVANT FACTS

When Naghdi was introduced to Polland, Naghdi

represented that his family owned a pharmaceutical business

known as Naghdi International, Inc. Further, Naghdi stated

that the business was worth approximately 50 million

dollars, and that he could buy large quantities of

pharmaceuticals at reduced prices from U.S. drug companies

[AE 7]. Naghdi then told Polland he had approximately eight

million bottles of pharmaceuticals for sale [AE 8].

Following this meeting Polland discussed Naghdi's offer with

his son and his business associate Russell. As a result of

the discussions with Polland, Russell decided to attempt to

7

locate a buyer for the pharmaceuticals [AE 8].

Upon Lanahan's assertions, this Court eventually found that Jack Russell was a co-conspirator [ST 48]. It was the government's position that Russell was a victim, not a conspirator [AE 7-8]. Russell was the only person found to be a conspirator along with Naghdi.

C

THE RULE

At the sentencing hearing the judge first noted that one can get organizer points if one supervised five or more persons, or if the organization is otherwise extensive. The judge then quoted the applicable application note:

> In assessing whether the organization is otherwise extensive, all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involves only three participants, but uses the unknowing services of many outsiders, could be considered.

ST, pp. 47-48. *emphasis added.* Thus, in order to be classified as an "organizer" under the guidelines one must either organize five or more knowing and willing participants or organize three knowing and willing participants and in addition must also utilize the unknowing services of many outsiders.

Section 3B1.1 only applies when the offense involves more than one person who is criminally responsible for the

8

commission of the offense.  <u>United States v. Anderson</u>, 942 F.2d 606 (9th Cir. 1991) (en banc).

### D

### THE DISTRICT COURT'S APPLICATION

This Court held that Jack Russell knew of Naghdi's alleged scheme and was involved with Naghdi from the beginning [ST 48].  Based upon this the court found that Naghdi was an organizer under the sentencing guidelines and assessed him an additional four offense points.

### E

### THE PROPER APPLICATION

The guidelines application note considers a scheme to be "otherwise extensive" if it involves <u>three</u> knowing participants and many unknowing outsiders.  This Court found that Jack Russell was conspiring with Naghdi, that constitutes two persons, not three.  This Court's application of the law, which is reviewed de novo, was erroneous and constitutes error. <u>United States v. Restrepo</u>, 903 F.2d 648, 651 (9th Cir. 1990).

### F

### CAUSE AND PREJUDICE

To demonstrate "cause" a party must show that he was impeded by some objective factor external to the defense.

9

<u>McCleskey v. Zant</u>, 499 U.S. 467, 111 S.Ct. 1454 (1991).

This error resulted in actual prejudice as it added four points to his offence level. If those four points had not been added his offense level would have been 27 allowing for a maximum sentence of 108 months which is five years less than he received. A longer sentence received constitutes actual prejudice.

## II

### THE DISTRICT COURT COMMITTED ERROR WHEN IT HELD THAT THE AMOUNT OF LOSS WAS SIX HUNDRED AND SIX MILLION, TWO THOUSAND, TWO HUNDRED AND NINETY-TWO DOLLARS

#### A

#### STANDARD

This Court's factual findings are reviewed for clear error. <u>United States v. Howard</u>, 894 F.2d 1085, 1087 (9th Cir. 1989). Questions of law are reviewed <u>de novo</u>. <u>United States v. Restrepo</u>, 903 F.2d 648, 651 (9th Cir. 1990).

#### B

#### RELEVANT FACTS

Naghdi received 11 offence points because the amount of loss was said to be over $5,000,000. This Court found the loss in this case to be $606,002,292 [ST 39]. The Belrico deal, which did not go through, involved $579,002,292 [AE 9], the Owens & Minor deal involved $27,000,000 [AE 11],

10

there were improper charges to Naghdi's Citicorp Diners card in the range of $22,000 to $37,000 [ST 34], and improper charges to Milton Poland's American Express card of approximately $20,000.

This Court also added an additional six offence points, arithmetically projecting the U.S.S.G. 2F1.1 table beyond the five million dollar/eleven offense point range, to the five hundred million to one billion dollar/seventeen point range [ST 53]. Thus, a total of seventeen offense points were allocated to Naghdi under 2F1.1 for an amount of loss found to be $606,002,292.

## C

### THE RULE

The *Application Notes* to section 2F1.1 of the applicable Sentencing Guidelines provide:

> 9.   *Dollar loss often does not fully capture the harmfulness and seriousness of the conduct. In such instances, an upward departure may be warranted. Examples may include the following:*
>
> *(f) completion of the offence was prevented, or the offence was interrupted before it caused serious harm.*

U.S.S.G. 2F1.1, Application Note 9, (1988).

This Court's application of the Sentencing Guidelines is reviewed de novo. United States v. Restrepo, 903 F.2d

11

648, 651 (9th Cir. 1990).

Where the actual loss significantly understates or overstates the seriousness of the defendant's conduct, an upward or downward departure may be warranted. U.S.S.G. § 2F1.1 Application note 9 (1988).

A District Court is statutorily authorized to depart from a guideline range if it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553 (b) (88).

When adjusting a sentence upward a district court must find by a preponderance of the evidence that the facts supporting the upward adjustment exist. United States v. Restrepo, 946 F.2d 654, 661 (9th Cir. 91) (en banc). The Court must "explain the extent of its departure with reference to the structure, standards, and policies of the Act and the Guidelines." United States v. Lopez Quintero, 21 F.3d 885, 894 (9th Cir. 94) citing United States v. Lira-Barraza, 941 F.2d 745, 751 (9th Cir. 91). "[I]n addition . . . the District Court must explain in detail the reason behind the imposition of a particular sentence, analogizing

12

to other Guidelines provisions". <u>Lopez Quintero</u>, 21 F.3d at 894.

### D

### THE DISTRICT COURT'S APPLICATION

This Court determined that the actual loss was over $606,002,292 and added 11 points to the defendant's offense level [TS 52] under 2F1.1(b)(L) and an additional 6 points using the arithmetic progression to forecast the guidelines in the five hundred million to one billion dollar range [TS 53].

### E

### THE PROPER APPLICATION

A reasonable interpretation of U.S.S.G. 2F1.1 in combination with its Application Note 9 indicates that the amount of loss in this case was merely in the range of $42,000 to $57,000, the amounts improperly charged on the credit cards.  Application Note 9 clearly provides that where the fraudulent deals did not go through, which is the case here, the court may depart from the guidelines.  As indicated above, when a court does depart from the guidelines it must make the appropriate factual findings, and explain its departure and its relation to the policy

13

behind the guidelines. United States v. Restrepo, 946 F.2d 654, 661 (9th Cir. 91) (en banc); and United States v. Lopez Quintero, 21 F.3d 885,894 (9th Cir. 94) citing United States v. Lira-Barraza, 941 F.2d 745,751 (9th Cir. 91).

Here this Court did not make the appropriate findings, and did not declare that it was departing from the guidelines because the amount lost did not accurately represent the seriousness of the offence.  It would have been proper for the Court to add four or five offence points depending on which side of $50,000 it ultimately decided the proper loss to be.

<br>

### F

### CAUSE AND PREJUDICE

This error prejudiced Naghdi greatly by adding seventeen points to his offence level instead of four or five.  Thus, instead of an offense level of 31 his offense level would have been 18 or 19, his criminal history unchanged at 3.  This would have given Naghdi a sentence range of 33 to 46 months, opposed to the 168 month sentence he received.

### III

14

**THE DISTRICT COURT COMMITTED ERROR WHEN IT SENTENCED NAGHDI FOR OFFENSES FOR WHICH HE HAD NOT BEEN EXTRADITED IN VIOLATION OF THE EXTRADITION TREATY**

### A

### STANDARD

This Court's factual findings are reviewed for clear error. United States v. Howard, 894 F.2d 1085, 1087 (9th Cir. 1989). Questions of law are reviewed de novo. United States v. Restrepo, 903 F.2d 648, 651 (9th Cir. 1990).

### B

### FACTS

On June 26th, 1987, prior to commission of the crime which is the subject of this law suit, Naghdi pled guilty and was convicted of Conspiracy, Manufacturing and Distributing a Counterfeit Drug and Trafficking in Goods Bearing Counterfeit Trademarks. Naghdi failed to appear for sentencing.

Naghdi was arrested for the wire fraud charges in the United Kingdom and extradited to the United States under the extradition treaty between the two countries. At the sentencing hearing for the wire fraud convictions Judge Keep, in calculating Naghdi's criminal history, considered his involvement in the earlier offense. Judge Keep noted at the sentencing hearing that Naghdi had not been charged with

15

bail jump or contempt [ST p.50, l.7-8]. She also noted that "[t]hey were separate cases. The one had finished, and this one started" [ST p.50, l.24-25].

C

THE RULE

The United States and the United Kingdom are party's to an extradition treaty under which Naghdi was arrested in the United Kingdom and extradited to the United States for prosecution. The relevant Article of the treaty states as follows:

ARTICLE XII

(1)  A person extradited shall not be detained or proceeded against in the territory of the requesting Party for any offense other than an extraditable offense established by the facts in respect of which his extradition has been granted, or on account of any other matters, nor be extradited by that Party to a third State —
(a)  until after he has returned to the territory of the requested Party; or
(b)  until the expiration of thirty days after he has been free to return to the territory of the requested Party.
(2)  The provisions of paragraph (1) of this Article shall not apply to offenses committed, or matters arising, after the extradition.
    – *Extradition Treaty attached hereto as Exhibit G.*

The Ninth Circuit summarized the <u>Specialty Doctrine</u> as preventing "the requesting nation from prosecuting an extradited individual for crimes other than those as to which the rendering state explicitly granted extradition".

16

United States v. Fowlie, 24 F.3d 1059, 1063-64 (9th Cir.
1994) citing United States v. Kahn, 993 F,2d 1368, 1373-74
(9th Cir. 1993).

### D

### THE PROPER APPLICATION

Naghdi was extradited for wire fraud pertaining to the
facts surrounding the Berlrico deal and the Owens & Minor
deal.  Pursuant to the extradition treaty and the specialty
doctrine it was proper to prosecute and sentence Naghdi for
acts involved in those two deals alone.

### E

### THE DISTRICT COURT'S APPLICATION

Judge Keep, when determining Naghdi's sentence, raised
his Criminal History Category from II to III based upon
Naghdi's conduct which led to a his plea of guilty on June
26th, 1987.  This conduct was not part of the Berlrico or
Owens & Minor deal, and was not properly considered by the
Court in sentencing Naghdi in this case.

### F

### CAUSE AND PREJUDICE

Naghdi failed to object to the improper consideration
of crimes for which he was not extradited in his sentencing

17

because his counsel was ineffective.  He was prejudiced by the error in that he received a sentence of 168 months where the maximum sentence should have been 151 months.

## IV

## NAGHDI'S COUNSEL WAS INEFFECTIVE

### A

### ISSUE

Naghdi's counsel, Lanahan, failed to provide the competent representation of his client's interests as required by the Sixth Amendment.

### B

### STANDARD

"Constitutional claims may be raised in collateral proceedings even if the defendant failed to pursue them on appeal." United States v. Schaflander, 743 F.2d 714, 717 (9th Cir. 84), cert. denied, 470 U.S. 1058, 84 L.Ed. 2d 832, 105 S. Ct. 1772 (85).

There is potential conflict, however, between Schflander and United States v. Johnson, 988 F.2d 941, 945 (9th Cir. 93) in which the 9th Circuit Court required the appellant to demonstrate cause and prejudice for his failure to raise claim of constitutional error on direct appeal.

18

Ineffective Assistance of counsel claims are properly addressed in a collateral attack upon the conviction under a 28 U.S.C. § 2255 motion.  United States v. Rewald, 889 F.2d 836, 859 (9th Cir. 1989) citing United States v. Schaflander, 743 F.2d 714 (9th Cir. 1984), cert. denied, 470 U.S. 1058, 84 L.Ed. 2d 832, 105 S. Ct. 1772 (1985), and United States v. Pope, 841 F.2d 954 (9th Cir. 1988).  The Rewald court went on to say that a 2255 motion is preferred over direct appeal as the proper forum for an ineffective assistance of counsel claim as the record is complete and thus reviewable in it's entirety.  889 F.2d at 859.

It would thus appear the a defendant need not demonstrate "cause and prejudice" when addressing an ineffective assistance of counsel claim in a 2255 motion. If however such a showing is required, it is clear in this case.

The cause for Naghdi's failure to raise this issue on direct appeal is simple:  Lanahan, the ineffective counsel himself, was the attorney in that appeal.  The prejudice is addressed below as one of the factors required in an ineffective assistance of counsel claim.

The Sixth Amendment to the United States Constitution guarantees effectiveness of competent counsel to a defendant

19

in a criminal case.  <u>Powell v. Alabama</u>, 287 U.S. 45 (1932).
The Supreme Court of the United States fashioned a test in
<u>Strickland v. Washington</u>, 466 U.S. 6898 (1984).  To prove
ineffectiveness the petitioner must show that the counsel's
conduct fell below an "objective standard of reasonableness"
and was "outside the wide range of professionally competent
assistance."  Additionally, the Petitioner must prove that
because of the error, the outcome is unreliable or
fundamentally unfair.  <u>Lockhart v. Fretwell</u>, 113 S.Ct. 838
(1993).

A defendant claiming ineffective assistance of counsel
must demonstrate (1) that counsel's actions were deficient,
and (2) that defendant was prejudiced because of counsel's
actions. <u>Strickland v. Washington</u>, 466 U.S.  668, 687-690,
80 L. Ed. 2d 674, 104 S. Ct. 2052 (84).

C

FACTS

1.   <u>Counsel's Failure to Present Naghdi's Theory of Defense</u>

Naghdi was convicted of nine counts of mail fraud for
allegedly conspiring to sell counterfeit pharmasuticals.  No
counterfeit pharmaseuticals were found.  Naghdi contended
that there was never any intent to sell pharmasuticals,
instead the pharmaceutical sales were a front for an

20

undercover arms sale between Iran and the United States.
Naghdi further contended that he was acting on behalf of the
Central Intelligence Agency and attempted to subpoena
various government officials to testify as to the validity
of his defense.

The District Court Judge, the Honorable Judith N. Keep,
was understandably worried about CIPA (Classified
Information Protection Act) problems and the possibility
that the motivation behind these subpoenas was an attempt to
"graymail" the government into dismissing Naghdi's charges.
([T2 5]; [T1 25; Judge Keep: "CIPA says if [the testimony
is] reasonably going to disclose classified information the
Defendant must make a showing"]).  Judge Keep ruled that she
would issue seven 17(b) subpoenas to various government
officials if Naghdi's claim was corroborated to her
satisfaction.  Judge Keep told Lanahan that he could
corroborate the CIA defense with any evidence sufficient to
convince her [T2 8] or by Naghdi signing his affidavit,
under seal, under penalty of perjury verifying the truth of
the statements within in order to make a showing of
necessity [T2 4].  Lanahan attempted to verify the defense
through a document titled "Memorandum of telephone
conversation" [Exhibit H] but it was not sufficient for

21

Judge Keep.

Lanahan never gave Naghdi the opportunity to verify his affidavit under oath and thus the witnesses were never subpoenaed and Naghdi's defense not presented.  Lanahan was confident that the Sixth Amendment's Right to compulsory process was absolute and Judge Keep requiring Naghdi to sign the affidavits under oath as a prerequisite to issuing the subpoenas violated Naghdi's Fifth Amendment right not to testify [T2 6].  Lanahan rejected Judge Keeps offer to have the affidavit sealed until after Naghdi's criminal trial [AB 3].  The Appellate Court found no merit in Lanahan's argument:  "At the outset, we note that there is no merit to appellant's assertion that swearing to the truth of the information in his attorney's affidavit would have meant relinquishing his fifth amendment right against self-incrimination to protect his sixth amendment right to compulsory process" [AB 3].

2.   Counsel's Failure to Properly Object to the Court's Characterization of Naghdi as an "Organizer" for Sentencing Purposes

This Court's factual findings will be reviewed for clear error. United States v. Howard, 894 F.2d 1085, 1087 (9th Cir. 1989).  The Court allocated 4 offence points to Naghdi for being an organizer under U.S.S.G. 3B1.1, finding

22

that Jack Russell was a co-conspirator. Section 3B1.1 only

applies when the offense involves more than one person who

is criminally responsible for the commission of the offense.

United States v. Anderson, 942 F.2d 606 (9th Cir. 1991) (en

banc). At the sentencing hearing the judge noted that one

can get organizer points if one supervised five or more

persons, or if the organization is otherwise extensive. The

judge then quoted the applicable application note:

> In assessing whether the organization is otherwise
> extensive, all persons involved during the course
> of the entire offense are to be considered. Thus,
> a fraud that involves only three participants, but
> uses the unknowing services of many outsiders,
> could be considered.

[ST 47-48 *emphasis supplied*]. Thus, in order to be

classified as an "organizer" under the guidelines one must

either organize five or more knowing and willing

participants or organize three knowing and willing

participants and in addition to organizing those three

knowing and willing participants one must also utilize the

unknowing services of many outsiders. In no event may the

provisions of 3B1.1 be utilized if there isn't at least one

other co-conspirator.

This Court did find that Russell was a co-conspirator

but only determined it at the insistence of Lanahan [ST 48].

The government was of the position that Russell was a

23

victim, not a co-conspirator [AE 7-8].

Lanahan succeeded in convincing this Court that Russell was involved in the fraud.  Had Lanahan not done so this Court would not have found that Naghdi had co-conspired with anyone and U.S.S.G. 3B1.1 would have been inapplicable. Lanahan was urging the Court to adopt the view that Naghdi did not perpetrate the fraud but was merely a pawn in Jack Russell's scheme.  This assertion was directly contrary to the jury's verdict and to attempt to argue it was futile. Lanahan conceded the applicability of U.S.S.G. 3B1.1 in an attempt to argue its inapplicability.  Lanahan did so by arguing this Court should find facts contrary to the jury's verdict.

3.   Counsel's Failure to Properly Object to the Court's
     Determination the Amount of Loss

Secondly, the Court allocated a total of 17 offense points, more than half of Naghdi's total offense points, under U.S.S.G. 2F1.1.  This Court improperly applied the term "amount of loss" and Lanahan failed to raise this issue.  As discussed earlier the application notes to the guidelines clearly state that where the fraud involves sums of money that were not actually lost because the scheme was not completed, as was the case here, the court may depart from the guidelines, which, as also discussed earlier,

24

requires a declaration and explanation, none of which were present here.

4.  **Counsel's Failure to Properly Object to the Court's Consideration of An Earlier Crime in Violation of the Extradition Treaty**

Prior to commission of the crime which is the subject of this law suit, on June 26th, 1987, Naghdi pled guilty and was convicted of Conspiracy, Manufacturing and Distributing a Counterfeit Drug and Trafficking in Goods Bearing Counterfeit Trademarks.  Naghdi failed to appear for sentencing.

Naghdi later participated in the crime which is the subject of this law suit, was arrested for this crime in the United Kingdom, and extradited to the United States pursuant to the extradition treaty in force between the two nations. This treaty specifies that a defendant extradited pursuant to the treaty shall be punished **solely** for the offence for which he is extradited.  The Court in this case enhanced Naghdi's Criminal History score from II to III based upon an offence Naghdi committed for which he was not extradited. [ST p.49 - 51].  The relevant Article of the treaty states as follows:

ARTICLE XII

(1)  A person extradited shall not be detained or proceeded against in the territory of the requesting Party

25

for any offense other than an extraditable offense
established by the facts in respect of which his extradition
has been granted, or on account of any other matters, nor be
extradited by that Party to a third State —
    (a)   until after he has returned to the territory of
the requested Party; or
    (b)   until the expiration of thirty days after he has
been free to return to the territory of the requested Party.
    (2)   The provisions of paragraph (1) of this Article
shall not apply to offenses committed, or matters arising,
after the extradition.

The Ninth Circuit summarized the Specialty Doctrine as

preventing "the requesting nation from prosecuting an

extradited individual for crimes other than those as to

which the rendering state explicitly granted extradition".

United States v. Fowlie, 24 F.3d 1059, 1063-64 (9th Cir.

1994) citing United States v. Kahn, 993 F,2d 1368, 1373-74

(9th Cir. 1993).

D

COUNSEL'S ACTIONS WERE DEFICIENT

To prove that a counsel's actions were deficient, a

defendant must show that his counsel made errors that "a

reasonable diligent and conscientious advocate would not

have made." Butcher v. Marquez, 758 F.2d 373, 376 (9th Cir.

1985).

A reasonable and conscientious advocate would not have

so poorly advised Naghdi not to verify an affidavit that

would have allowed subpoenas to be issued and Naghdi's

26

theory of defense, namely that of public authority, to be
presented.  As the Court of Appeals noted, Lanahan's
reasoning was wholly without merit [OP 3].

A reasonable and conscientious advocate would not have
alleged the existence of the only co-conspirator in an
attempt to convince this Court to find a U.S.S.G. section
inapplicable.  This was a fact finding against the jury's
verdict when the advocate's allegation of the co-conspirator
itself rendered the U.S.S.G. section applicable.

A reasonable and conscientious advocate would have
objected to this Court's application of the "amount of loss"
section of the U.S.S.G. (2F1.1) where this Court's
application was contrary to the guideline's application
notes themselves.

A reasonable and conscientious advocate would have
objected to this Court's consideration of an offense when
sentencing, when consideration of such offense is explicitly
in violation of the extradition treaty which brings the
defendant before this Court.

### E

### COUNSEL'S DEFICIENT ACTIONS PREJUDICED NAGHDI

To show prejudice, a defendant "need not show that
counsel's deficient conduct more than likely altered the

27

outcome of the case". <u>Strickland</u>, 466 U.S. at 693. Rather a defendant need only show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. <u>Strickland</u>, 466 U.S. at 694.

Naghdi's prejudice stems from the fact that he was never afforded the opportunity to present his defense. When asked about his dealings Naghdi was clear that he was dealing in arms on behalf of the CIA and that the pharmasuticals were never found because they did not exist. In Lanahan's Appellate Brief, with ten pages of facts, Naghdi's claimed defense consisted of two pages. If Lanahan did not believe Naghdi's defense he should have withdrawn from representation, and should have not continued representing him when the representation was going to be adversely affected.

Lanahan's failure to present Naghdi's defense even in the meekest fashion, afforded the jury no reasonable choice but to find him guilty. They probably sensed that Naghdi's own lawyer didn't believe him. These actions resulted in the most severe prejudice: A nineteen year jail sentence without ever having the opportunity to adequately tell his side of the story.

28

## VI

### CONCLUSION

For the foregoing reasons, Javid Naghdi asks that this Court reverse his conviction for wire fraud and remand this case for a new trial or provide him with new counsel.  In the alternative, he requests that his sentence of fourteen years be adjusted to correct the sentencing errors committed at trial.

Respectfully Submitted,

JAVID NAGHDI

By: _____
JOB SEREBROV, Attorney at Law
Ark. Att. No. 94006
P.O. Box 1427
Siloam Springs, AR  72761
501-575-0576

29

1               UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF CALIFORNIA

3

4   UNITED STATES OF AMERICA,     )   Case No. 88-0768-K-Crim.
                                     )
5              Plaintiff,      )   San Diego, California
                                       )
6   vs.                               )   Monday,
                                     )   May 7, 1990
7   JAVID NAGHDI,                 )   8:30 a.m.
        a/k/a David Naghdi,        )
8       a/k/a Gregorio Reynolds,  )
        a/k/a Khukon Reynolds,    )
9                                  )
               Defendant.      )
10   ————————————————————————— )

RECEIVED
JUL 0 ~ 1995
SEC.——FILE——PEND.——

11               TRANSCRIPT OF SENTENCING
           BEFORE THE HONORABLE JUDITH N. KEEP
12          UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   For the Plaintiff:          PHILLIP HALPERN, ESQ.
                                 Assistant United States
15                                Attorney
                                 940 Front Street, Room 5-N-19
16                               San Diego, California  92189

17   For the Defendant:          FEDERAL DEFENDERS OF SAN DIEGO
                                 BY:   JOHN LANAHAN, ESQ.
18                                 225 Broadway, Suite 500
                                 San Diego, California 92101
19
    Transcript ordered by:      JOHN LANAHAN, ESQ.
20
    Court Recorder:            Renee Green
21                                United States District Court
                                940 Front Street
22                                San Diego, California 92189

23

24

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

1  they were his, and that's, of course, what Supnick was

2  trying to slow down.  He wanted the box to be opened, the

3  drugs to be taken out and tested.

4        Objection number ten, the Diner's Club.  I'm not

5  sure what the correct figure is.  I incorporate the

6  Government's response, page 7, line 4 through 24.  I note

7  that the total amount is irrelevant for guideline purposes,

8  and we can -- so I don't think it needs to be corrected.  It

9  appears that it's somewhere between 22,000 and 37,000 on the

10  Diner's Club.

11        Number 11, the Court is asked to strike additional

12  information concerning the effect that Naghdi had actually

13  been counterfeiting.  I deny that.

14        I find that that information is extremely relevant

15  for evaluating whether the points should be added in this

16  case, for an offense involving more than minimal planning,

17  under 2(f)(1.1)(b)(2)(a), whether the offense involves

18  specific skill, 3(b)(1.3),and whether the offense was likely

19  to cause physical and psychological harm, 2(f)(1.1).

20        Further, there should be room in the probation

21  report for the victim's statement.  It is important.

22        Additionally, it suggested, in that same

23  objection, number 11, that it's all speculative that there

24  was -- there would be harm, because there is no evidence of

25  actual counterfeiting.

1    should be 606 million, 2,292 dollars.   I find that that 806

2    million dollar figure was a typo.   Due to the fact that, as

3    the Government pointed out in its response, that,

4    essentially, for calculating the departure, the 606 million

5    figure was, in fact, used.

6            Basically, then, going into your offense level

7    objections on page 7 --

8            MR. LANAHAN:   Your Honor -- your Honor, could I

9    just make one statement based on the factual rulings?

10           THE COURT:   Yes.

11           MR. LANAHAN:   I think -- I didn't -- I didn't

12   raise these specifically in my objections, because I

13   didn't -- or, it didn't appear that they were going to be

14   victims, but to the extent the Court is considering the

15   statements of representatives of drug companies as victims,

16   I would ask the Court not consider it, and I don't think

17   that would be the effect of a victim impact statement.

18           I think, under Boothe vs. Maryland and South

19   Carolina vs. Gathers, that is improper.

20           I didn't -- I didn't raise it in my papers, only

21   because I didn't view them as victim impact statements.   But

22   if you are going to consider them, I ask you not do so in

23   that context.

24           THE COURT:   Well, I'm not sure -- you know, you're

25   throwing this at me.   Frankly, I don't know what those cases

1   by being truthful to the Probation Department.  There are a

2   number of other ways.  But there is absolutely nothing in

3   this case which would justify Mr. Naghdi receiving those .

4   points.

5        He made a tactical decision, and he must take the

6   consequences of those.  So, under 3(e)(1.1), there is

7   nothing that he did that would justify acceptance of

8   responsibility points.

9        And I would just note that U.S. vs. Gonzalez, slip

10  opinion at 2490, I believe it was April of 1990, cited by

11  the Government, indicated there is no absolute right to

12  acceptance of responsibility points.        ;

13       Also, the Defendant objects to the organizer.  The

14  Government brought out that he should be given the organizer

15  points, and the probation officer did not ask for that, and

16  the Government does, under 3(b)(1.1), and I find it is

17  appropriate.

18       Basically, one can get organizer points either if

19  one supervised five or more persons, or if the organization

20  was otherwise extensive.

21       And the application note provides:

22       "In assessing whether the organization is

23       otherwise extensive, all persons involved during

24       the course of the entire offense are to be

25       considered.  Thus, a fraud that involves only

48

1          three participants, but uses the unknowing

2          services of many outsiders, could be considered."

3          I would note that there would be numerous persons

4     that would be in this list, but certainly on -- on

5     evaluating whether it's otherwise extensive, you have Jack

6     Russell, Ashad Sharari (phonetic), Milton Polland, Peter

7     Polland, Jose Ponton.  You had whomever did the printing.

8     There were also -- and making of the documents, to name just

9     but a few in this otherwise extensive organization.

10          Now, Defense makes the suggestion that Jack

11    Russell was the organizer of this, and not Mr. Naghdi.

12    First of all, the Government says there could be more than

13    one organizer, but secondly, I would point out, the evidence

14    clearly is that Mr. Naghdi was the organizer of this fraud,

15    unquestionably the organizer of the fraud.

16          Basically, in this particular case, I would just

17    point out that, certainly, the letter of credit was made out

18    to his corporation -- his supposed corporation.  His -- he

19    was in England, as a fugitive from the Los Angeles case.

20    And, therefore, it appears -- my construction of the

21    evidence is that Jack Russell was legitimately involved from

22    the beginning, picked up as to what was going on, and

23    certainly became a willing co-conspirator, having just heard

24    the evidence thus far.

25          I don't know what it would be if he were indicted.

1  But that's clearly how it appears.

2        Because of the fact that Mr. Naghdi was a fugitive

3  in England, he certainly used Jack Russell to make contacts

4  face to face with persons whom he could not make, because he

5  was hiding out as a fugitive.

6        By the same token, it is clear, from everything

7  that was said, when you listen to the testimony of Supnick,

8  Chowdry (phonetic), even the tapes with Ponton, that

9  everything had to be cleared through Naghdi.  And all the

10  documents were made in the corporation, Naghdi

11  International, Inc., not Jack Russell International, Inc.

12        I'm sure Jack Russell, if what I heard was true,

13  might be planning on getting a healthy sum out of this, but

14  this was Naghdi's operation.

15        And I would just note, as an aside, Jack Russell

16  was not involved in the L.A. case, whereas Mr. Naghdi, of

17  course, was.

18        Then, discussing the departure, basically,

19  the -- on the criminal history, Defendant objects, saying

20  that the Los Angeles case and this are the same case, so

21  it's certainly not proper to add points.

22        Indeed, the co-defendants got six months, and Mr.

23  Naghdi, five years, probably because of the bail jump.

24        I cannot make that finding.  It's just as easy to

25  make the finding that Judge Real gave him a higher sentence

1  because of the fact he was the leader of the group, out of

2  the defendants that were, in fact, indicted.

3        Moreover, that does not negate the fact that under

4  the guidelines, he did not get points for bail jump or a

5  contempt, basically, violating the conditions of his bond

6  while he was on Pretrial Services.

7        He has not been charged or convicted of a bail

8  jump.  He's not been charged with a contempt.  And,

9  certainly, even this abusive trust -- he was out on bond for

10  the same offense, and he not only jumps, he gets involved in

11  the same type of offense, much more extensively.

12        There were no points counted on the guidelines for

13  that.  And so, therefore, I find all of those factors would

14  be appropriate to consider on the criminal history score.

15        And I've also made my findings concerning the fact

16  that this was not a -- that this was a wire fraud that did,

17  in fact, involve drug -- the plan to sell counterfeit drugs.

18  So, I find that those were appropriate, again responding to

19  your objection at the top of 15.

20        Basically, finally then, you're saying that I have

21  to give a concurrent sentence under 5(g)(1.3) to the Los

22  Angeles case.  I do not find that this is the same

23  counterfeiting scheme involved in Los Angeles -- and

24  therefore, I have to impose concurrent time.  They were

25  separate cases.  The one had finished, and this one started.

1        I find, basically, the Los Angeles case is a dry

2 run for this case. This is a much larger, much more

3 extensive scheme than was involved in Los Angeles.

4        It's basically -- an analogy would be, a defendant

5 who would be arrested for sales of methamphetamine gets out

6 on bond, and goes back and sells methamphetamine on a much

7 more extensive level, to make money to pay for his attorney

8 and to take care of his family if he's convicted. That

9 would be an analogy to this case. And you do not have to

10 run those concurrent.

11        And by the same token, in this case, I find you

12 don't have to run them concurrent. There was a start and a

13 finish to the charges in Los Angeles. Unfortunately, Mr.

14 Naghdi apparently just interrupted, stopped for a while, but

15 then planned this scheme on a much more extensive basis.

16        Finally, in your response to response, I just

17 would note again, that you make the point on page 5 that

18 Jack Russell was the organizer, and I hope that I've dealt

19 with that. I make an absolute contrary finding -- I think

20 he was a principal in this, but I think, clearly, that Mr.

21 Naghdi was the principal in this particular offense.

22        You also say that I should make special findings

23 downward because of health problems. I'm not sure what

24 health problems Mr. Naghdi does have. Basically, it appears

25 that he does have some health problems. But in the Defense

1  objections, they said he didn't take the medicine.  So, the

2  significance of those, I'm not sure of.

3           I certainly cannot make a finding that, based upon

4  those, I should make a deduction, since Mr. Naghdi, in the

5  last couple of years, has indicated he is such a serious

6  danger to the society in this country that he has adopted.

7           Counsel points out he does not get credit because

8  he was -- for the time, since he was arrested in London.  I

9  do not feel I have to make any adjustments for that.  He did

10  not get credit because he was arrested in London on a

11  fugitive warrant, and he fought extradition.  He was

12  arrested on the L.A. case, not this one.

13           I also -- there was a request that I make a

14  recommendation against judicial deportation.  I decline

15  that, based on this case and the L.A. case.  I find that the

16  balance shifts towards society in this case, and I certainly

17  would decline to make that recommendation.

18           Therefore, I do find that the base offense level

19  is six.  He does, in fact, get a plus 11, because the loss

20  is over five million dollars.

21           I also find a plus two because the offense

22  involved more than minimal planning under

23  2(f)(1.1)(b)(2)(a); also, plus two because under 3(b)(1.3),

24  special skill.  He gets no points off for acceptance of

25  responsibility and he gets a plus four as an organizer on

53

1  3(b)(1.1).

2           PROBATION OFFICER TRUSSO:  Your Honor?  This

3  happens to be one of those unique cases where we have both

4  special skill --

5           THE COURT:  No, I'm going to get to that.

6           PROBATION OFFICER TRUSSO:  Okay, but you cannot do

7  both.

8           THE COURT:  I know.  I'm going to subtract it.

9  Then, he gets a plus six using the arithmetic progression

10 for over five million dollars.  Then, he gets a plus two for

11 psychological and physical harm.  That would mean that it

12 would be a total offense level of thirty-three and a

13 criminal history score of three.

14          Under 3(b)(1.3), I cannot add the points for both

15 being an organizer and of using trust, under 3(b)(1.1),

16 which would mean I would have to subtract two points, so the

17 total guidelines would be thirty-one and a criminal history

18 score of three.

19          However, I want to make the finding that I find

20 that he has abused a position of trust because if for any

21 reason a court of appeals would not say -- would say that

22 there were too many point they added on an arithmetic

23 progression, or whatever, or some other computation, or that

24 he was not an organizer, then, indeed, I want to -- it be

25 reflected that at this time I would have added those two

COPY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,                )
                                         )
                  Plaintiff,             )
                                         )
                                         )   Case No. 88-0768-K
vs.                                      )
                                         )
JAVID NAGHDI,                            )
a/k/a David Naghdi,                      )
a/k/a Gregorio Reynolds,                 )
a/k/a Khukon Reynolds,                   )
a/k/a Doctor Behrouz Mansouri,           )
                                         )
                  Defendant.             )
- - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF STATUS HEARING
Taken in San Diego, California
January 30, 1990

BEFORE THE HONORABLE JUDITH N. KEEP

Mary C. Prather                 Echo Reporting
Transcriber                     7046 Enders Avenue
                                San Diego, California 92122
                                (619) 453-3325

1    affidavit -- and I don't want the affidavit, I just want

2    some notice. Because if he's talking about here -- which I

3    think he's conceded he has -- individuals involved in the

4    Iran/Contra affair, who are going to testify -- in terms of

5    the subpoenas I've seen already -- about all shipments of

6    arms from the United States to Iran, through Israel, that

7    are connected to Mr. Naghdi, this is certainly something

8    that would bring out classified information. And CIPA says

9    if it's reasonably going to disclose classified information,

10    the Defendant must make a showing.

11        I am just simply performing my function

12    here -- and I've done it now for a couple of weeks -- saying

13    I think if this is happening, the Defense should be required

14    to file a notice so the Government can look at it, and we

15    can respond, and we can do it in camera.

16        THE COURT: (Indiscernible.)

17        MR. HALPERN: I mean, I had no notice of --

18        THE COURT: No, no, no, I understand, but let's

19    cut you -- let's assume we go back -- as I said, I seal

20    this, I seal that -- the oral statements. We -- but

21    Mr. Lanahan calls you, right away, and gives you the list, I

22    agree with you, that you are somewhat hamstrung as to

23    knowing whether there is a CIPA problem.

24        Is there a way that, not only if I issue

25    some -- or authorize the issuance of some subpoenas, it



# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

Case No. 88-0768-K

DAVID NAGHDI,
a/k/a David Noghdi,
a/k/a Gregorio Reynolds,
a/k/a Khukon Reynolds,
a/k/a Doctor Behrouz Mansouri,

- - - - - - - - - - - - - - - -

TRANSCRIPT OF IN CHAMBERS CONFERENCE
Taken in San Diego, California
January 31, 1990

BEFORE THE HONORABLE JUDITH N. KEEP

Mary C. Prather
Transcriber

Echo Reporting
7046 Enders Avenue
San Diego, California 92122
(619) 453-3325

C — 40

1          THE COURT:  Good.  Then, he can come in.

2          MR. LANAHAN:  Yeah, and I think -- I figured he

3  should know about it.

4      (Pause.)

5          THE COURT:  Thank you.  I actually had excluded

6  you, and I'm glad you noticed him, because I'll tell

7  you (indiscernible).

8          MR. LANAHAN:  Sure.

9          THE COURT:  Okay.  Yesterday, when we were in

10  chambers, I told Mr. Lanahan that I would, in fact, issue a

11  subpoena for seven out of the eighteen persons named in the

12  affidavit filed by Mr. Lanahan on January 16, 1990.  Do you

13  now know those names?

14          MR. HALPERN:  He informed me.

15          THE COURT:  Okay.  Now, the thing that has

16  troubled me, all along, as you know, is whether there is

17  any -- I keep getting reliability mixed up with

18  necessity -- and, basically, the law says 17B subpoenas are

19  subpoenas of witnesses as opposed to documents by persons

20  who are not able to pay, providing these persons are

21  necessary to an adequate defense.  The burden of showing the

22  necessity is on the Defendant.  The Defendant must show that

23  testimony would be relevant and favorable, U.S. v

24  Valenzuela-Bernal, 458 F.2d 858, 867.

25          I know that you tried to distinguish that orally

4

1    picked an out-of-district situation, which I think all of

2    these are.  I believe all seven of them.

3              MR. LANAHAN:  That's true.

4              THE COURT:  So, on the one hand, you make that

5    very compelling point.  On the other hand, is trying to

6    interpret what these (indiscernible) mean.

7              What I -- in thinking this through, basically, the

8    affidavit that was in support of this, which I found to be

9    sufficiently fact specific on behalf of those seven persons,

10   is filed by Mr. Lanahan on information and belief.  And this

11   troubled me a lot last night, and a lot this morning.  And

12   I've stewed about it ever since then.

13             MR. LANAHAN:  Okay.

14             THE COURT:  So, I basically, had my law clerk call

15   Mr. Lanahan in today.  I will sign those -- he's prepared

16   those subpoenas; I'll sign them.  But, I really believe that

17   the affidavit should be signed by Mr. Naghdi under penalty

18   of perjury, even though it's under seal, to make a showing

19   of necessity.

20             Now, taking it a step beyond this case -- I mean,

21   I have -- because all of the CIA documents -- or the request

22   for documents have come up negative.  I have no idea where

23   this theory came from.  Do you understand?  I mean, I'm not

24   saying you made it up, but it's possible -- it would be

25   possible in a situation for a counsel to make it up -- the

5

1   graymail situation that you were talking about yesterday.  I

2   am not impugning these are --

3           MR. LANAHAN:  Well, no -- no.  I understand just

4   what you're saying, because I see your problem.  I'm going

5   to try and -- I see your problem, so don't worry.  There's

6   no umbrage taken at all.

7           THE COURT:  So, that's the -- you see that --

8           MR. LANAHAN:  No, I understand that.

9           THE COURT:  They're -- in factoring in necessity

10  and relevance for the Defense, you've got to make sure that

11  there is some reliability -- well, not necessarily.  In

12  making a valid judgment of necessity and relevance, you have

13  to say, "Yes, their testimony may be necessary and

14  relevant", but it seems like there has to be some threshold

15  question.  You can have a defendant, in any case like this,

16  who would want to subpoena, for example, a lot of people in

17  Government, or anywhere else, just from names that that

18  person could hear on the television or read in the

19  newspapers.  You know, they've got the story, and I

20  have -- without giving me any indication that that person is

21  willing to sign on the line about it, or some proration,

22  somehow, so I can say, "Yes, this does, in fact, appear

23  necessary."

24          I don't even know if he's going to proffer his

25  defense yet.

6

1          MR. LANAHAN:  Well, the -- I understand your

2   point, and I think the problem is what you're -- if you

3   require him to file an affidavit under penalty of perjury,

4   he gives up the Fifth Amendment right to exercise a Sixth

5   Amendment right.

6          THE COURT:  How is that a problem?  It wouldn't be

7   unsealed unless --

8          MR. LANAHAN:  Well, right.  If you're never going

9   to consider this -- let's assume -- all right, I mean,

10  I -- all right, that's -- how's it ever going to have any

11  teeth unless it can never be considered later on?  That's

12  the problem.

13         MR. HALPERN:  Well, the Defendant shouldn't be

14  able to lie, though.  Should he be --

15         MR. LANAHAN:  Well --

16         MR. HALPERN:  If he has a defense --

17         THE COURT:  Well, let's say that you wouldn't

18  consider it for --

19         MR. HALPERN:  For trial -- absolutely --

20         THE COURT:  -- for trial.

21         MR. HALPERN:  -- or sentencing.

22         THE COURT:  Well, the -- I don't care

23  (indiscernible).  Oh, you're saying like an instruction.

24         MR. HALPERN:  Oh, I wouldn't -- if that's the only

25  problem, we can say it will be unsealed after sentencing.  I

C- 44

1      So, I did a little research on it about a year or

2   two ago, and I recall that it was unclear if they could

3   always put it under seal, and because it was unclear, I

4   never took it any farther.  But I had no doubt that it was

5   well within their rights.  If a person wants to have an

6   attorney, at government expense, they have to file an

7   affidavit under seal.

8      I don't see this as any different.  If a person

9   wants a witness at Government expense, he has to file an

10  affidavit that's put under seal.  So --

11      THE COURT:  Well, the only thing I'm saying is --

12      MR. HALPERN:  I'm not troubled as long as it's

13  kept sealed until after sentencing.  What possible harm

14  could there be to the Defendant?  I don't -- as I'm saying,

15  I'm giving up any right to use it.  I don't know if it has

16  to be kept under seal until sentencing, but I'm waiving it.

17  I mean, if that's the Court's only concern, I'm more than

18  happy to forget about it until after the trial is over.

19      THE COURT:  Unless you have some other thing --

20      MR. LANAHAN:  In other words --

21      THE COURT:  Unless there's something else you can

22  show me that would make any kind of an indication that this

23  really would be what's necessary and relevant on his

24  defense -- but all of the subpoena duce tecums have come

25  back negative.

C - 75

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,    )
                                    )
            Plaintiff-Appellee, )
                                      )
     v.                     )
                                    )   **C.A. No. 90-50300**
                                    )   **D.C. No. 88-0768-K**
JAVID NAGHDI,              )
  aka David Naghdi,       )
  aka Gregorio Reynolds,  )
  aka Khukon Reynolds,    )
  aka Dr. Bherouz Mansouri, )
                                    )
           Defendant-Appellant.)

## APPELLEE'S BRIEF

APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

WILLIAM BRANIFF
United States Attorney

BRUCE R. CASTETTER
Assistant U.S. Attorney
Chief, Appellate Section
Criminal Division

PHILLIP L.B. HALPERN
Assistant U.S. Attorney

940 Front Street, Room 5-N-19
San Diego, California 92189-0150
Telephone: (619) 557-5165

Attorneys for Plaintiff-Appellee
United States of America

D. 46

future.[1]  Prior to delivery, Naghdi was arrested on a criminal complaint filed in Los Angeles on March 27, 1987 [II RT 57-58].

The criminal complaint alleged that appellant had been manufacturing and distributing counterfeit Naprosyn [II RT 57-58].  Thereafter, a 13 count indictment (No. 87-0368) against Naghdi was returned by a federal grand jury.  On June 26, 1987, Naghdi pled guilty to four counts charging him with conspiracy, manufacturing, and distributing a counterfeit drug, and trafficking in goods bearing counterfeit trademarks [II RT 58].  Naghdi's sentencing was set for August 3, 1987.  On that date, appellant failed to appear and a no-bail arrest warrant was issued [VI RT 135-137].

### 2.  The Criminal Offense

Following Naghdi's arrest and guilty plea, but prior to his sentencing date, he was introduced to Milton Polland, President of Central Pacific Assurance, Ltd., Los Angeles, California [VII RT 11].  At this meeting, Naghdi told Polland that: (1) his family owned a pharmaceutical business known as Naghdi International, Inc.; (2) the business was worth approximately 50 million dollars; and (3) he could buy large quantities of pharmaceuticals at reduced prices from U.S. drug companies. [VI RT 189-190; VII RT 11-23, 28-29, 36].[2]

---

[1]    On February 9, 1987, Mallinckrodt, Inc., a chemical manufacturer, shipped over ten thousand pounds of acetaminophen to Naghdi International, Inc., in Los Angeles. This shipment was paid for by a check issued on the personal account of Javid Naghdi [II RT 43-50].  According to an FDA analysis, this shipment would have been sufficient to produce millions of tablets of counterfeit Naprosyn.

[2]    In order to establish his bona fides, Naghdi gave Polland a forged statement from a C.P.A. indicating that Naghdi International did millions of dollars in annual business [VI 182-185; VII 11-12].

7

During the meeting, Naghdi inquired whether Polland was interested in trying to find a buyer for three million bottles of Tagamet, three million bottles of Anspor (an antibiotic manufactured by SmithKline), and two million bottles of Naprosyn. that Naghdi International had stored in a warehouse in Tampico, Mexico.  According to Naghdi, the drugs were available because a prior sale fell through due to problems obtaining a letter of credit [VII RT 37-38].  Following this initial meeting, Milton Polland discussed Naghdi's offer with his son, Peter Polland, Secretary of Central Pacific, and a business associate, Jack Russell, President of National Benefit Consultants, Inc., Los Angeles, California ("NBC Sales") [VII RT 13-14].  As a result of their discussions, Russell decided to follow up Naghdi's offer to locate a buyer for the drugs [VII RT 11-29, 40].

### a.   The Belrico Contract[10]

Based on the lure of substantial commissions, Russell (on behalf of Javid Naghdi) contacted several brokers, including Ed Charol of Trading Services Company, Stanford, Connecticut ("TSC"), and Jose Ponton, Sr., of Able Distributors, Inc., Washington, D.C. ("Able Distributors").  After Charol expressed interest, Russell sent Charol's company a formal offer from Naghdi International confirming that he had 3,000,024 bottles of Tagamet, 3,000,024 bottles of Anspor, and 2,000,004 bottles of Naprosyn for sale. Among other things, this offer falsely represented that the drugs were manufactured by SmithKline and Syntex [IX RT 44-51].

---

[10]   All evidence of this contract was brought out by appellant, not the government [IX 44-169].

In June 1987, after receiving Naghdi International's offer, Charol contacted Shuvendu Roy Chowdhury of Belrico Handel und Handelaberatung Gesellschaft M.B.H., Vienna, Austria ("Belrico"), to see if he could assist in finding a buyer for the Tagamet, Anspor, and Naprosyn. Prior to locating a buyer, Chowdhury personally spoke with Naghdi and requested detailed documentation confirming that the offer was genuine. In response, appellant provided numerous forged documents falsely representing, inter alia, that the drugs were sold by SmithKline and Syntex to Naghdi International [IX RT 140-142]. After receiving the forgeries, Chowdhury sent a delegation to the Iranian Government to determine if it was interested in purchasing the drugs offered for sale by Naghdi International.

Eventually, utilizing the services of Michael Machura and his company, International Development and Promotion Company, Ltd., Vienna, Austria ("IDPC"), Chowdhury arranged to sell the drugs to the Iranian Government. The agreed upon price was $579,002,292, less commissions [IX RT 61-98]. After arranging the sale to Iran (through IDPC), Belrico sent Russell a letter confirming Belrico's contract with Naghdi International to purchase the three million bottles of Tagamet, three million bottles of Anspor, and two million bottles of Naprosyn.

Although a formal contract was entered into by the parties toward the end of 1987, the deal was held up by Naghdi's failure to allow inspection of the pharmaceuticals [IX RT 118, 133-136, 150]. When Iran's representative, Michael Machura, traveled to Tampico, Mexico, to inspect the goods, he and Russell were denied access to

9

the warehouse where the drugs were located.   They did, however, inspect original documentation for the shipment [IX RT 110-115].

b.   The Owens & Minor Contract

At the same time Russell was conducting the Belrico negotiations, SmithKline was receiving inquiries about the legitimacy of similar offers regarding the sale of unusually large quantities of Tagamet and Anspor at prices far below the normal wholesale price [II RT 142-144].   One such call was received on October 5, 1987, from Michael Barnett, a businessman in Burlington, Washington [II RT 142, 159].   Mr. Barnett stated that he had received an offer from Lone Star Distributors to sell three million bottles of Tagamet, three million bottles of Anspor, and two million bottles of Naprosyn [II RT 143].[11]

Following Barnett's call, SmithKline contacted the FDA and the Federal Bureau of Investigation [II RT 144].   In these calls, SmithKline notified both agencies that it had received suspicious inquiries about the sale of a large quantity of Tagamet and Anspor. SmithKline also stated that the price and the quantities suggested that the drugs might be counterfeit [II RT 142-144].

After being informed of the suspicious inquiries, FDA agents contacted Michael Barnett to obtain more information [II RT 159-160].   After discerning that the Tagamet, Anspor, and Naprosyn were being offered for sale with false lot numbers and expiration dates, federal agents requested that Barnett cooperate in an investigation

_____

[11]   Another such offer was made to Foxmeyer Trading Company, the third largest pharmaceutical wholesaler in the United States [II RT 74-75].   Upon receiving the offer, Foxmeyer aggressively pursued the sale expending a great deal of time and money [II RT 136-137].

[II RT 152-154].  Barnett agreed, and subsequently contacted Lone Star to follow up on the offer [II RT 162].

Barnett quickly learned from Lone Star that the original "lot" of Tagamet, Anspor, and Naprosyn had allegedly been sold [II RT 166, 169].  However, he also learned that an additional lot of Tagamet would be available around the beginning of 1988 [II GE 2].[12/]  If Barnett wished to purchase this lot, he was instructed to contact Jose Ponton at Able Distributors.  Upon making contact, Ponton made it clear that his company would sell no less than one million bottles of Tagamet at a time [II RT 172-173].  After expressing interest in the Tagamet, Barnett informed Ponton (per instructions from federal agents) that he was operating as a broker for Dan Saunders of Owens & Minor, Inc., [II RT 175-178] a legitimate pharmaceutical distributor in Richmond, Virginia [II RT 203-204].

In mid-February 1988, United States Customs Service Special Agent Daniel Supnick contacted Able Distributors in an undercover capacity [III RT 3-4; V GE].  The agent identified himself as Daniel Saunders, West Coast Representative for Owens & Minor [VI GE 1].  After extensive negotiations with a number of employees and the exchange of a myriad of documents, Jose Ponton, on behalf of Able Distributors, and the agent entered into a contract to sell one million bottles of Tagamet (allegedly manufactured by SmithKline) to Owens & Minor for 27 million dollars [III RT 6-36].

---

[12/]"GE" stands for the excerpts of the tapes played by the government.  Individual excerpts are identified by Roman numerals corresponding to the supplemental exhibits submitted in this case.

ก - า

On or about February 29, 1988, Ponton introduced Supnick to his supplier, Jack Russell [III RT 36-39; XI GE]. During their initial conversation, Russell explained that the Tagamet was being sold by Naghdi International, a company which he described as possessing very strong connections to SmithKline [XI GE 3]. Russell also relayed Naghdi's claim that Naghdi International was able to obtain Tagamet at such a low price due to the large quantities it purchased from SmithKline [XI GE 3-4].

Following their initial conversation, Russell took over the final arrangements and requested that Supnick change the contract to reflect Naghdi International as the seller of the Tagamet [III RT 49-50]. Subsequently, Russell sent Supnick the amended contract signed by both Naghdi and Russell [III RT 50-52]. Throughout these negotiations with Ponton and Russell, Supnick insisted that Owens & Minor required personal sampling and testing of the Tagamet prior to paying on the letter of credit [III RT 54; XIII GE 3].

In April 1988, Naghdi telephoned Supnick several times [III RT 54-59, 87-90; XV GE; XV and XVI GE]. During their conversations, Naghdi falsely represented to the federal agent that SmithKline was selling the Tagamet directly to Naghdi International [III RT 55-57]. Naghdi also falsely stated that SmithKline had to gather the full consignment of one million bottles, so that he could send Supnick samples bearing the specific lot numbers that SmithKline was allegedly producing for the shipment [III RT 107].[12]

---

[12]    These samples, later delivered to Supnick by Peter Polland, were in fact genuine Tagamet. However, an examination of the lot numbers revealed that they were not part of a one million bottle shipment from SmithKline to Naghdi International [III RT 103-107].

D-52

card to convey the impression of great wealth, e.g. purchases at Harrods' gourmet food hall.    Despite Diners Club attempts to confiscate the card and prohibit its further use, Naghdi improperly charged $38,000 in expenses and purchases [VIII RT 137-152].

While residing in London, Naghdi also convinced Milton Polland to guarantee his hotel bill so that Naghdi could continue to reside at the Hotel Intercontinental [VIII RT 120-127; IX RT 174].  Naghdi repeatedly assured Polland that he would actually pay the hotel bill and all related expenses so they would not be charged to Polland's American Express card.  Naghdi also falsely asserted that he only needed Polland to guarantee his bill because he checked into the Hotel Intercontinental under the assumed name, Gregorio Reynolds.  Despite these representations, appellant fled the Hotel in the middle of the night without paying his bill [VIII 128]. This ended up costing Polland approximately $20,000 [VII RT 27].

### d.    Appellant's Arrest

On August 8, 1988, the United States Department of State sent a telex to the American Embassy in London, England, instructing them to request a provisional arrest warrant for Javid Naghdi [IX RT 181-182].   In order to effectuate the arrest, Agent Supnick arranged to meet Naghdi on August 11, 1988, at the Dorchester Hotel. During the meeting, appellant continued to maintain that the one million bottles of Tagamet was presently in Tampico, Mexico [XXXVI-XXXVIII GE].

Upon exiting Supnick's room, Naghdi was arrested by Scotland Yard on the provisional arrest warrant based on Naghdi's conviction in the Central District [IX RT 186-187].  At the police station, appellant professed not to understand what was happening as he had

14

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | U.S.C.A. No. **90-50300** |
| Defendant-Appellee, | U.S.D.C. No. **88-0768-01-K** |
| v. | |
| **JAVID NAGHDI,** | |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the Southern District of California
Honorable Judith N. Keep, District Judge Presiding

### BRIEF FOR APPELLANT

**JOHN LANAHAN**
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 500
San Diego, California  92101-5097
Telephone:  (619) 234-8501 ext. 104

Attorneys for Defendant-Appellant

1990. [E.R. 1]. This is within the ten days required by Rule 4(b) of the Federal Rules of Appellate Procedure.

### 5. Bail Status

The defendant is now serving a sentence of fourteen years in prison imposed on the all counts of conviction, to be served consecutive to a five year sentence of imprisonment imposed in case number 87-368-R, imposed by the Hon. Manuel Real in the United States District Court for the Central District of California [E.R. 28-30; C.R. 57; ST 54]. Mr. Naghdi has been in custody since August 11, 1988, the date he was arrested in the United Kingdom on an extradition warrant based on a failure to appear for sentencing in case 87-368-R in the Central District of California.

### B. Proceedings and Disposition in the District Court

On September 23, 1988, a twenty-five count indictment was filed in the United States District Court for the Southern District of California, charging the appellant Javid Naghdi with the offenses of wire fraud, in violation of 18 U.S.C. § 1343 [E.R.

---

refers to the jury trial on February 9, 1990; IVi TTr refers to proceedings outside the presence of the jury on February 12, 1990; V TTr refers to the jury trial on February 13, 1990; VI TTr refers to the jury trial on February 14, 1990; VII TTr refers to the jury trial on February 15, 1990; VIII TTr refers to the jury trial on February 16, 1990; VIIIi TTr refers to proceedings outside the presence of the jury on February 21, 1990; IX TTr refers to the jury trial on February 22, 1990; X TTr refers to the jury trial on February 23, 1990; XI TTr. refers to the trial on February 28, 1990; XIIi TTr refers to the jury note on February 28, 1990; XIIii TTr refers to the jury verdict on February 28, 1990; ST refers to the sentencing hearing on May 7, 1990.

3

# FILED

**JAN 30 1992**

N O T   F O R   P U B L I C A T I O N

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,      )
                               )
        Plaintiff-Appellee,    )      No. 90-50300
                               )
             v.                )      D.C. No. CR-88-0768-01-K
                               )
JAVID NAGHDI, aka DAVID NAGHDI,)      MEMORANDUM*
                               )
        Defendant-Appellant.   )
_____)

Appeal from the United States District Court
for the Southern District of California
Judith N. Keep, District Judge, Presiding

Argued and Submitted September 10, 1991
Pasadena, California

Before:   BEEZER, HALL, and WIGGINS, Circuit Judges

Javid Naghdi appeals his conviction by a jury on nine counts
of wire fraud in violation of 18 U.S.C. § 1343. He also appeals
his fourteen year sentence. The district court had jurisdiction
pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28
U.S.C. § 1291 and 18 U.S.C. § 3742. We affirm.

---

\* This disposition is not appropriate for publication and may not
be cited to or by the courts of this circuit except as provided by
9th Cir. R. 36-3.

I

Appellant's conviction on nine counts of wire fraud arose out of an elaborate scheme to manufacture and sell counterfeit pharmaceutical drugs. The scheme comprised two transactions (the Belrico deal and the Owens-Minor deal), neither of which was ever completed. The Belrico deal was not completed because the victims were never allowed to inspect the pharmaceuticals they were purchasing. The Owens-Minor deal, which appellant transacted with an undercover government agent, ended with appellant's arrest. Both deals were set in motion after appellant had pled guilty on June 26, 1987 to several charges arising out of a similar scheme to manufacture and sell counterfeit pharmaceuticals. Both deals were transacted while appellant was a fugitive from justice having failed to appear for sentencing on the 1987 charges.

At trial, appellant raised the defense of public authority, claiming that he acted with the imprimatur of the Central Intelligence Agency, which he asserted employed him to serve as a contact with the Iranian government in negotiations over the sale of arms to that country. The conduct for which he was prosecuted, he maintained, was part of a CIA plot to cover up those arms sales.

II

Appellant's first claim is that the district court violated his sixth amendment right to compulsory process when it refused to issue Rule 17(b) subpoenas to several high government officials whose testimony appellant alleged was necessary to support his

-2-

A-2

"public authority" defense.  The only evidence appellant offered
to show that the testimony was "necessary" to his defense, as
required by Rule 17(b), was his attorney's ex parte affidavit
containing allegations based on information and belief.  The
district court agreed to issue the subpoenas only if appellant
would swear to the truth of those allegations.  Appellant refused
to swear to the information contained in the affidavit and the
court refused to issue the subpoenas.  We review a district
court's ruling regarding Rule 17(b) subpoenas for abuse of
discretion.  United States v. Sims, 637 F.2d 625, 629 (9th Cir.
1980).  We find no abuse here.

At the outset, we note that there is no merit to appellant's
assertion that swearing to the truth of the information in his
attorney's affidavit would have meant relinquishing his fifth
amendment right against self-incrimination to protect his sixth
amendment right to compulsory process.  In Simmons v. United
States, 390 U.S. 377 (1968), the Supreme Court held that a
criminal defendant's fourth amendment rights cannot not be
conditioned on his abandonment of his fifth amendment rights.
Thus a defendant's testimony in support of a motion to suppress
evidence may not be admitted against him at trial on the issue of
guilt.  But Simmons does not apply here because the district
court's agreement to seal counsel's affidavit until after
sentencing would have prevented the government from using
appellant's statement against him at either trial or sentencing.

# UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

## Extradition

*Treaty, protocol of signature and exchange of notes signed at London June 8, 1972;*
*Ratification advised by the Senate of the United States of America June 21, 1976;*
*Ratified by the President of the United States of America September 10, 1976;*
*Ratifications exchanged at Washington October 21, 1976;*
*Proclaimed by the President of the United States of America November 17, 1976;*
*Entered into force January 21, 1977.*
*With exchange of notes*
*Signed at Washington October 21, 1976.*

---

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

## A PROCLAMATION

CONSIDERING THAT:

The Treaty on Extradition between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, a Protocol of Signature, and an exchange of notes were signed at London on June 8, 1972, the texts of which Treaty and related documents, are hereto annexed;

The Senate of the United States of America by its resolution of June 21, 1976, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty and the related documents;

The Treaty and the related documents were ratified by the President of the United States of America on September 10, 1976, in pursuance of the advice and consent of the Senate, and were duly ratified on the part of the United Kingdom of Great Britain and Northern Ireland;

It is provided in Article XVI of the Treaty that the Treaty shall enter into force three months after the date of the exchange of instruments of ratification;

The instruments of ratification of the Treaty were exchanged at Washington on October 21, 1976; and accordingly the Treaty and the related documents enter into force on January 21, 1977;

Now, THEREFORE, I, Gerald R. Ford, President of the United States of America, proclaim and make public the Treaty, Protocol of Signature, and the exchange of notes, to the end that they shall be observed and fulfilled with good faith on and after January 21, 1977, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this seventeenth day of November in the year of our Lord one thousand nine hundred seventy-[SEAL]   six and of the Independence of the United States of America the two hundred first.

GERALD R. FORD

By the President:
  HENRY A. KISSINGER
    *Secretary of State*

TIAS 8468

G – 60

Case 3:88-cr-00768-K   Document 69   Filed 09/03/96   PageID.79   Page 71 of 86

## EXTRADITION TREATY
## BETWEEN THE GOVERNMENT OF THE UNITED STATES
## OF AMERICA AND THE GOVERNMENT OF THE UNITED
## KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

The Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland;

Desiring to make provision for the reciprocal extradition of offenders;

Have agreed as follows:

### ARTICLE I

Each Contracting Party undertakes to extradite to the other, in the circumstances and subject to the conditions specified in this Treaty, any person found in its territory who has been accused or convicted of any offense within Article III, committed within the jurisdiction of the other Party.

### ARTICLE II

(1) This Treaty shall apply:

(a) in relation to the United Kingdom: to Great Britain and Northern Ireland, the Channel Islands, the Isle of Man, and any territory for the international relations of which the United Kingdom is responsible and to which the Treaty shall have been extended by agreement between the Contracting Parties embodied in an Exchange of Notes; and

(b) to the United States of America;

and references to the territory of a Contracting Party shall be construed accordingly.

(2) The application of this Treaty to any territory in respect of which extension has been made in accordance with paragraph (1) of this Article may be terminated by either Contracting Party giving six months' written notice to the other through the diplomatic channel.

### ARTICLE III

(1) Extradition shall be granted for an act or omission the facts of which disclose an offense within any of the descriptions listed in the Schedule annexed to this Treaty, which is an integral part of the Treaty, or any other offense, if:

(a) the offense is punishable under the laws of both Parties by imprisonment or other form of detention for more than one year or by the death penalty;

(b) the offense is extraditable under the relevant law, being the law of the United Kingdom or other territory to which this Treaty applies by virtue of sub-paragraph (1) (a) of Article II; and

(*c*) the offense constitutes a felony under the law of the United States of America.

(2) Extradition shall also be granted for any attempt or conspiracy to commit an offense within paragraph (1) of this Article if such attempt or conspiracy is one for which extradition may be granted under the laws of both Parties and is punishable under the laws of both Parties by imprisonment or other form of detention for more than one year or by the death penalty.

(3) Extradition shall also be granted for the offense of impeding the arrest or prosecution of a person who has committed an offense for which extradition may be granted under this Article and which is punishable under the laws of both Parties by imprisonment or other form of detention for a period of five years or more.

(4) A person convicted of and sentenced for an offense shall not be extradited therefor unless he was sentenced to imprisonment or other form of detention for a period of four months or more or, subject to the provisions of Article IV, to the death penalty.

## Article IV

If the offense for which extradition is requested is punishable by death under the relevant law of the requesting Party, but the relevant law of the requested Party does not provide for the death penalty in a similar case, extradition may be refused unless the requesting Party gives assurances satisfactory to the requested Party that the death penalty will not be carried out.

## Article V

(1) Extradition shall not be granted if:

(*a*) the person sought would, if proceeded against in the territory of the requested Party for the offense for which his extradition is requested, be entitled to be discharged on the grounds of a previous acquittal or conviction in the territory of the requesting or requested Party or of a third State; or

(*b*) the prosecution for the offense for which extradition is requested has become barred by lapse of time according to the law of the requesting or requested Party; or

(*c*) (i) the offense for which extradition is requested is regarded by the requested Party as one of a political character; or

(ii) the person sought proves that the request for his extradition has in fact been made with a view to try or punish him for an offense of a political character.

(2) Extradition may be refused on any other ground which is specified by the law of the requested Party.

## Article VI

If the person sought should be under examination or under punishment in the territory of the requested Party for any other offense, his extradition shall be deferred until the conclusion of the trial and the full execution of any punishment awarded to him.

TIAS 8468

A-62

### ARTICLE VII

(1) The request for extradition shall be made through the diplomatic channel, except as otherwise provided in Article XV.

(2) The request shall be accompanied by:

(a) a description of the person sought, his nationality, if known, and any other information which would help to establish his identity;

(b) a statement of the facts of the offense for which extradition is requested;

(c) the text, if any, of the law

   (i) defining that offense;

   (ii) prescribing the maximum punishment for that offense; and

   (iii) imposing any time limit on the institution of proceedings for that offense;

and

(d) (i) where the requesting Party is the United Kingdom, a statement of the legal provisions which establish the extraditable character of the offense for which extradition is requested under the relevant law, being the law of the United Kingdom or other territory to which this Treaty applies by virtue of sub-paragraph (1)(a) of Article II;

   (ii) where the requesting Party is the United States of America, a statement that the offense for which extradition is requested, constitutes a felony under the law of the United States of America.

(3) If the request relates to an accused person, it must also be accompanied by a warrant of arrest issued by a judge, magistrate or other competent authority in the territory of the requesting Party and by such evidence as, according to the law of the requested Party, would justify his committal for trial if the offense had been committed in the territory of the requested Party, including evidence that the person requested is the person to whom the warrant of arrest refers.

(4) If the request relates to a convicted person, it must be accompanied by a certificate or the judgment of conviction imposed in the territory of the requesting Party and by evidence that the person requested is the person to whom the conviction refers and, if the person was sentenced, by evidence of the sentence imposed and a statement showing to what extent the sentence has not been carried out.

(5) The warrant of arrest, or the judicial document establishing the existence of the conviction, and any deposition or statement or other evidence given on oath or affirmed, or any certified copy thereof shall be received in evidence in any proceedings for extradition:

(a) if it is authenticated in the case of a warrant by being signed, or in the case of any other original document by being certified, by a judge, magistrate or other competent authority of the requesting Party; or in the case of a copy by being so certified to be a true copy of the original; and

TIAS 8468

(b) where the requesting Party is the United Kingdom, by being sealed with the official seal of the appropriate Minister and certified by the principal diplomatic or consular officer of the United States of America in the United Kingdom; and where the requesting Party is the United States of America, by being sealed with the official seal of the Department of State for the Secretary of State; or

(c) if it is authenticated in such other manner as may be permitted by the law of the requested Party.

## ARTICLE VIII

(1) In urgent cases the person sought may, in accordance with the law of the requested Party, be provisionally arrested on application through the diplomatic channel by the competent authorities of the requesting Party. The application shall contain an indication of intention to request the extradition of the person sought and a statement of the existence of a warrant of arrest or a conviction against that person, and, if available, a description of the person sought, and such further information, if any, as would be necessary to justify the issue of a warrant of arrest had the offense been committed, or the person sought been convicted, in the territory of the requested Party.

(2) A person arrested upon such an application shall be set at liberty upon the expiration of forty-five days from the date of his arrest if a request for his extradition shall not have been received. This provision shall not prevent the institution of further proceedings for the extradition of the person sought if a request is subsequently received.

## ARTICLE IX

(1) Extradition shall be granted only if the evidence be found sufficient according to the law of the requested Party either to justify the committal for trial of the person sought if the offense of which he is accused had been committed in the territory of the requested Party or to prove that he is the identical person convicted by the courts of the requesting Party.

(2) If the requested Party requires additional evidence or information to enable a decision to be taken on the request for extradition, such evidence or information shall be submitted within such time as that Party shall require.

## ARTICLE X

If the extradition of a person is requested concurrently by one of the Contracting Parties and by another State or States, either for the same offense or for different offenses, the requested Party shall make its decision in so far as its law allows, having regard to all the circumstances, including the provisions in this regard in any Agreements in force between the requested Party and the requesting States, the relative seriousness and place

of commission of the offenses, the respective dates of the requests, the *nationality of the person sought and the possibility of subsequent extradition* to another State.

## ARTICLE XI

(1) The requested Party shall promptly communicate to the requesting Party through the diplomatic channel the decision on the request for extradition.

(2) If a warrant or order for the extradition of a person sought has been issued by the competent authority and he is not removed from the territory of the requested Party within such time as may be required under the law of that Party, he may be set at liberty and the requested Party may subsequently refuse to extradite him for the same offense.

## ARTICLE XII

(1) A person extradited shall not be detained or proceeded against in the territory of the requesting Party for any offense other than an extraditable offense established by the facts in respect of which his extradition has been granted, or on account of any other matters, nor be extradited by that Party to a third State—

(a) until after he has returned to the territory of the requested Party; or

(b) until the expiration of thirty days after he has been free to return to the territory of the requested Party.

(2) The provisions of paragraph (1) of this Article shall not apply to offenses committed, or matters arising, after the extradition.

## ARTICLE XIII

When a request for extradition is granted, the requested Party shall, so far as its law allows and subject to such conditions as it may impose having regard to the rights of other claimants, furnish the requesting Party with all sums of money and other articles—

(a) which may serve as proof of the offense to which the request relates; or

(b) which may have been acquired by the person sought as a result of the offense and are in his possession.

## ARTICLE XIV

(1) The requested Party shall make all necessary arrangements for and meet the cost of the representation of the requesting Party in any proceedings arising out of a request for extradition.

(2) Expenses relating to the transportation of a person sought shall be paid by the requesting Party. No pecuniary claim arising out of the arrest, detention, examination and surrender of a person sought under the provisions of this Treaty shall be made by the requested Party against the requesting Party.


6-65

### ARTICLE XV

A request on the part of the Government of the United States of America for the extradition of an offender who is found in any of the territories to which this Treaty has been extended in accordance with paragraph (1) of Article II may be made to the Governor or other competent authority of that territory, who may take the decision himself or refer the matter to the Government of the United Kingdom for their decision.

### ARTICLE XVI

(1) This Treaty shall be ratified, and the instruments of ratification shall be exchanged at Washington as soon as possible.  It shall come into force three months after the date of the exchange of instruments of ratification. [1]

(2) This Treaty shall apply to any offense listed in the annexed Schedule committed before or after this Treaty enters into force, provided that extradition shall not be granted for an offense committed before this Treaty enters into force which was not an offense under the laws of both Contracting Parties at the time of its commission.

(3) On the entry into force of this Treaty the provisions of the Extradition Treaty of December 22, 1931 [2] shall cease to have effect as between the United Kingdom and the United States of America.

(4) Either of the Contracting Parties may terminate this Treaty at any time by giving notice to the other through the diplomatic channel.  In that event the Treaty shall cease to have effect six months after the receipt of the notice.

In witness whereof the undersigned, being duly authorized thereto by their respective Governments, have signed this Treaty.

Done in duplicate at London in the English language this  8 k day of June, 1972.

For the Government of the United States of America:

*W H Annenberg* [3]

For the Government of the United Kingdom of Great Britain and Northern Ireland:

*Anthony Kershaw* [4]

---

[1] Jan. 21, 1977.
[2] TS 849; 47 Stat. 2122.
[3] W. H. Annenberg
[4] Anthony Kershaw

TIAS 8468

G-66

## SCHEDULE

### List of offenses referred to in Article III

1. Murder; attempt to murder, including assault with intent to murder.
2. Manslaughter.
3. Maliciously wounding or inflicting grievous bodily harm.
4. Unlawful throwing or application of any corrosive or injurious substance upon the person of another.
5. Rape; unlawful sexual intercourse with a female; indecent assault.
6. Gross indecency or unlawful sexual acts with a child under the age of fourteen years.
7. Procuring a woman or young person for immoral purposes; living on the earnings of prostitution.
8. Unlawfully administering drugs or using instruments with intent to procure the miscarriage of a woman.
9. Bigamy.
10. Kidnapping, abduction, false imprisonment.
11. Neglecting, ill-treating, abandoning, exposing or stealing a child.
12. An offense against the law relating to narcotic drugs, cannabis sativa L, hallucinogenic drugs, cocaine and its derivatives, and other dangerous drugs.
13. Theft; larceny; embezzlement.
14. Robbery; assault with intent to rob.
15. Burglary or housebreaking or shopbreaking.
16. Receiving or otherwise handling any goods, money, valuable securities or other property, knowing the same to have been stolen or unlawfully obtained.
17. Obtaining property, money or valuable securities by false pretenses or other form of deception.
18. Blackmail or extortion.
19. False accounting.
20. Fraud or false statements by company directors and other officers.
21. An offense against the bankruptcy laws.
22. An offense relating to counterfeiting or forgery.
23. Bribery, including soliciting, offering or accepting bribes.
24. Perjury; subornation of perjury.
25. Arson.
26. Malicious damage to property.
27. Any malicious act done with intent to endanger the safety of persons travelling or being upon a railway.
28. Piracy, involving ships or aircraft, according to international law.
29. Unlawful seizure of an aircraft.

TIAS 8468

6-67

## PROTOCOL OF SIGNATURE

At the time of signing this day the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland (hereinafter referred to as " the Treaty "), the undersigned have agreed as follows:

(1) Article III of the Treaty shall permit the Government of the United States of America to obtain the extradition of a person for an offense to which the Treaty relates when United States Federal jurisdiction is based upon interstate transport or transportation or the use of the mails or of interstate facilities, these aspects being jurisdictional only.

(2) This Protocol of Signature shall form an integral part of the Treaty.

In witness whereof the undersigned, being duly authorized thereto by their respective Governments, have signed this Protocol.

Done in duplicate at London in the English language this  8 th day of June, 1972.

For the Government of the United States of America :

For the Government of the United Kingdom of Great Britain and Northern Ireland :

TIAS 8468

G - 68

[EXCHANGES OF NOTES]

FOREIGN AND COMMONWEALTH OFFICE
LONDON S.W. 1

GNX 2/301/1                                             8 JUNE 1972

His Excellency
    The Honourable
        WALTER H ANNENBERG
            etc etc etc
                *Grosvenor Square*
                    *London W1A 1AE*

YOUR EXCELLENCY

I have the honour to refer to Article 16, paragraph (2), of the Extradition Treaty between our two Governments signed today.

It is the understanding of the Government of the United Kingdom that, without prior concurrence by both Governments, no application will be made for the extradition of a person for an offence committed before the Treaty signed today enters into force if extradition of such person for that offence, or any other offence, has previously been denied because the offence was not included in the Extradition Treaty between the United Kingdom and the United States, signed at London on 22 December, 1931.

I would appreciate receiving confirmation that the foregoing is also the understanding of the Government of the United States.

I have the honour to be
with the highest consideration
Your Excellency's obedient Servant
(For the Secretary of State)

R. V. RICHARDSON

EMBASSY OF THE UNITED STATES OF AMERICA
LONDON

JUNE 8, 1972

EXCELLENCY:

I have the honor to acknowledge receipt of your note of June 8, 1972 which reads as follows:

"I have the honour to refer to Article 16, paragraph (2), of the Extradition Treaty between our two Governments signed today.

"It is the understanding of the Government of the United Kingdom that, without prior concurrence by both Governments, no applica-

TIAS 8468

tion will be made for the extradition of a person for an offence committed before the Treaty signed today enters into force if extradition of such person for that offence, or any other offence, has previously been denied because the offence was not included in the Extradition Treaty between the United Kingdom and the United States, signed at London on 22 December, 1931.

"I would appreciate receiving confirmation that the foregoing is also the understanding of the Government of the United States."

I confirm that the foregoing is also the understanding of the Government of the United States.

Accept, Excellency, the renewed assurances of my highest consideration.

WALTER ANNENBERG

THE SECRETARY OF STATE FOR
    FOREIGN & COMMONWEALTH AFFAIRS
        FOREIGN OFFICE
            *London, S.W.1.*

---

BRITISH EMBASSY,
Washington, D.C.

21 OCTOBER 1976

SIR

I have the honour to refer to the Extradition Treaty between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the United States of America signed at London on 8 June 1972. In accordance with the provisions of paragraph (1)(a) of Article II I have the honour to propose that, with effect from the date of entry into force of the Treaty, the application of the Treaty shall extend to those territories listed in the Annex to this Note for the international relations of which the United Kingdom is responsible.

If the foregoing proposal is acceptable to the Government of the United States of America, I have the honour to propose that this Note, together with its Annex and Your Excellency's reply in that sense, shall constitute an Agreement between the two Governments in this matter.

I avail myself of this opportunity to renew to you, Sir, the assurance of my highest consideration.

PETER RAMSBOTHAM

THE HONORABLE
    HENRY A KISSINGER
        *Secretary of State of the United States of America*
            *Washington DC*

TIAS 8468

(a - 70)

Case 3:88-cr-00768-K   Document 69   Filed 09/03/96   PageID.89   Page 81 of 86

## ANNEX

Antigua
Belize
Bermuda
British Indian Ocean Territory
British Virgin Islands
Cayman Islands
Dominica
Falkland Islands and Dependencies
Gibraltar
Gilbert Islands
Hong Kong
Montserrat
Pitcairn, Henderson, Ducie and Oeno Islands
St Christopher, Nevis and Anguilla
St Helena and Dependencies
St Lucia
St Vincent
Solomon Islands
Sovereign Base Areas of Akrotiri and Dhekelia in the Island of Cyprus
Turks and Caicos Islands
Tuvalu

DEPARTMENT OF STATE
WASHINGTON

OCTOBER 21, 1976

EXCELLENCY:

I have the honor to acknowledge receipt of your note of October 21, 1976, which reads as follows:

"Sir

I have the honour to refer to the Extradition Treaty between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the United States of America signed at London on 8 June 1972. In accordance with the provisions of paragraph (1)(a) of Article II I have the honour to propose that, with effect from the date of entry into force of the Treaty, the application of the Treaty shall extend to those territories listed in the Annex to this Note for the international relations of which the United Kingdom is responsible.

If the foregoing proposal is acceptable to the Government of the United States of America, I have the honour to propose that

TIAS 8468

(7-71)

this Note, together with its Annex and Your Excellency's reply in that sense, shall constitute an Agreement between the two Governments in this matter.

I avail myself of this opportunity to renew to you, Sir, the assurance of my highest consideration.


## ANNEX

Antigua
Belize
Bermuda
British Indian Ocean Territory
British Virgin Islands
Cayman Islands
Dominica
Falkland Islands and Dependencies
Gibraltar
Gilbert Islands
Hong Kong
Montserrat
Pitcairn, Henderson, Ducie and Oeno Islands
St Christopher, Nevis and Anguilla
St Helena and Dependencies
St Lucia
St Vincent
Solomon Islands
Sovereign Base Areas of Akrotiri and Dhekelia in the Island of Cyprus
Turks and Caicos Islands
Tuvalu"


I have the honor to inform Your Excellency that the foregoing is acceptable and reflects correctly the understanding of the Government of the United States of America, and that Your Excellency's note and this note in reply concurring therein, together with its Annex, constitute an agreement between our two Governments concerning the Extradition Treaty between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the United States of America signed at London on 8 June 1972.


TIAS 8468

G-72

Accept, Excellency, the renewed assurances of my highest consideration.

For the Secretary of State:

CHARLES W ROBINSON

HIS EXCELLENCY
THE HONORABLE
SIR PETER E. RAMSBOTHAM, G.C.V.O., K.C.M.G.,
*British Ambassador*

ncy's reply
een the two

u, Sir, the

e Island of

e foregoing is
Government
ency's note
its Annex,
ts concerning
United King-
overnment
1972.

TIAS 8468

CONFIDENTIAL - SENSITIVE INFORMATION

Memorandum of telephone conversation

Between

Mr. Ed Charol
(203) 325-4091

And

Dennis P. Degan
Field Steroid Coordinator

RE:  allegations of arms deal to Iran

On 2-28-89 I  called Mr. Charol  in response to  a message he
left with  my office.  Mr. Charol  stated that  he had spoken
with Mr. Roy Chowdhury in Vienna, Austria.

According  to Charol,  Chowdhury told  him that  he is  being
pressured by  the individuals  in Iran  who were  supposed to
receive  the   excess   profits   from   the   $579,000,000
pharmaceutical  deal which Chowdhury,  Charol,  Machura  and
Jack Russell  were arranging  with the  Iranian Government on
behalf of Javid Naghdi.

(Documents  in this  original  deal  of Tagamet,  Anspor and
Naprosyn  indicated  that  around  $100,000,000  was  to  be
deposited in  numbered bank  accounts for  Mr. X,  Mr. Y, and
Mr.   Z.,  when  the  goods  were  delivered  to  Iran.)

The  Iranians reportedly  told  Chowdhury  that  they  wanted
their money now that  the deal was completed.  They indicated
that  the ship carrying  the containers with  the  serial
numbers specified in  the original deal,  arrived in Iran  in
November, 1988. They stated that  they had proof of this  and
that the goods were in fact delivered.

The  Iraninas further  reportedly  indicated  that the  whole
pharmaceutical deal was  just a cover  for an arms  shipment,
and that Naghdi was acting  as an operative on behalf  of the
U.S.  Government. They  also  reportedly  said that  the deal
was  concluded by  Naghdi and  his superiors  even as  Naghdi
remained incarcerated in London.

The  bottom  line,  according  to  Charol,  was  that  these
Iranians wanted their money.

He stated that  the Iranians threatened  to expose the  whole
arms   deal   if   they   did   not   get   their   money.

H - 74

Mr. Charol indicated he and Roy were now trying to figure out what was going on. He expressed the opinion that if this was in fact a cover for a U. S. arms deal, it would be a disaster. He added that if the arms mentioned in the Austrian magazine were real, that the deal could not have been done without the involvement of the U.S. Government.

Mr. Charol further indicated that the Iranians were reportedly now in Vienna meeting with Mr. Chowdhury, and that he may be speaking with him this evening or tomorrow.

I suggested to Mr. Charol that he call Chowdhury and advise Chowdhury to attempt to get proof that the 47 containers were actually delivered to Iran, by stating that he was also out a lot of money, but that he would need proof before he could attempt to do anything about the situation.

Mr. Charol indicated that he would do so and would get back with me. I further advised Mr. Charol that I would be calling him to set up an appointment to come to Connecticut and talk to him about the documents he furnished me regarding the $579,000,000 deal.

[ It should be noted that this explanation for what was allegedly going on, if not a sham by individuals trying simply to gain money through false pretenses, would be consistant with the docements just furnished us by the American Embassy in Vienna. Those documents are purported to be telexes between Machura in Vienna, and Rafhshanjanni of the Iranian Parliament. The documents clearly show that the $579,000,000 dollars was not for 47 containers of Tagamet, Anspor and Naprosyn, but was in fact for about $500,000,000 of various arms and a small amount of the three pharmaceuticals - (which could serve as a cover for the arms). This would also not be inconsistant with the documents discovered in Naghdi's briefcase at the time of his arrest in London, showing each of the 47 containers with descriptions of both arms and pharmaceuticals in each container. ]


Dennis P. Degan
Field Steroid Coordinator


cc:   Phil Halpern, AUSA San Diego
cc:   Dan Supnik, Special Agent, U. S. Customs
cc:   Larry McDade, DOJ
cc:   Charles H. Everline, Director, DCMO
cc:   Memo Book
cc:   TAG TAB 38
cc:   Jon Hunt

14-75